

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00075-CV

_____

IN THE INTEREST OF E.F., A CHILD

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-FM2019-0259

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

The sole complaint in this termination-of-parental-rights appeal is that the State failed to sufficiently prove that appellant Father endangered his child Eric according to Texas Family Code Section 161.001(b)(1)(D) and (E), after Eric suffered near-fatal injuries while in Father's care. After reviewing the entire record and determining that the Department proved sufficiently that Father endangered Eric, we affirm the trial court's judgment.

**Applicable Law and Evidentiary-Sufficiency Standards of Review**

Because our appellate review turns solely on applying the Family Code and evidentiary standards of review to the facts adduced at trial, we dispense with an introductory recitation of the background facts and begin with the applicable law and standards of review.

To terminate Father's parental rights, the Department needed to prove by clear and convincing evidence that Father's actions satisfied at least one conduct ground in Family Code Section 161.001(b)(1) and that Eric's best interest warranted termination. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). "Clear and convincing" evidence "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened burden of proof because "[a] parental rights termination proceeding encumbers a value 'far more precious than

2

any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

Here, the Department alleged two conduct grounds because of Eric's injuries: that Father had "(D) knowingly placed or knowingly allowed [Eric] to remain in conditions or surroundings which endanger[ed Eric's] physical or emotional well-being . . . [and had] (E) engaged in conduct or knowingly placed [Eric] with persons who engaged in conduct which endanger[ed Eric's] physical or emotional well-being." Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E). "'[E]ndanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but . . . endangering conduct need not [even] be directed at the child." *E.N.C.*, 384 S.W.3d at 803 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

A single act or omission can support termination under subsection (D), which focuses on either the parent's conduct or the conduct of a person with whom the parent placed the child. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). Subsection (D) requires us to examine evidence related to a child's environment to determine if it was the source of endangerment. *In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *6 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.).

Under section 161.001(1)(E), the parent's conduct—acts or failures to act—must directly cause the endangerment. *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.); *J.F. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00593-CV, 2016 WL 7584309, at *7 (Tex. App.—Austin Dec. 22, 2016, no pet.) (mem. op.). Absence of self control and propensity for violence may be considered as evidence of endangerment. *J.F.*, 2016 WL 7584309, at *7; *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

When a party challenges whether the Department produced legally sufficient evidence to prove a conduct ground, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved; we consider undisputed evidence even if contrary to the challenged finding. *Id.*

When a party challenges whether the Department's conduct-ground evidence is factually sufficient, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). But in doing so, we still give due deference to the factfinder's finding; we may not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must decide whether a factfinder could

4

reasonably form a firm conviction or belief that the Department proved the alleged conduct ground. *See* Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Under either review, we must remember that only the factfinder may judge the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## Applicable Facts

### Eric's Injuries

Eric was 28 days old on July 5, 2019, the day he was so severely injured. Mother had left Eric in Father's care while she ran errands. Great-grandmother, who was over 60 years old, had arrived at the house only a short time before Eric was injured. Only Father and Great-grandmother stayed in the house with Eric.

After Mother had been gone for about 45 minutes to an hour, Father called her to tell her Eric was "breathing weird." She went home immediately to find Eric's face swollen, his lips turning blue, and his breathing shallow. Mother "eventually" called the police.[1] Emergency responders took Eric to United Regional in Wichita Falls.

The hospital staff intubated Eric. They also gave him a blood transfusion. Along with a bruise on Eric's right jaw, hospital staff noted swollen lips and bruises

---

[1]According to the police report, she called Father's mother first.

on his left chin, forehead, and lower back. Later that night, Eric was airlifted to Cook Children's Medical Center in Fort Worth.

After Eric arrived at Cook Children's, the staff discovered that he had head and skull fractures, hematomas on both sides, hip- and pelvic-area fractures resulting from a twisting motion, fractures under both knees, and a fracture above one of his feet. The hospital informed the police that Eric had also suffered "severe hypoxic ischemic brain injury," a "thrombosed bridging vein," a "possible contusional tear of the right frontal pole of the brain," and "multilevel ligamentous sprain of the cervical spine." Hospital staff diagnosed Eric with "[t]raumatic brain injury from non accidental trauma."

Eric stayed at Cook Children's for two weeks. During part of that time, he required "ongoing ventilatory support." Cook Children's removed his tube after about a week; at that time, the family had accepted the possibility of "imminent death," and Mother had to prepare for end-of-life care for him.

Cook Children's discharged Eric to Hospice of Wichita Falls where Eric ended up improving. By the time of trial, Eric had made "wonderful progress" according to Mother, although he did not use his left arm and hand "as much" because it stayed curled, and his right foot turned in and caused him trouble walking. He also saw a neurologist periodically to assess his brain function.

**Hospital Notes' Narration of Events**

The transfer report to Cook Children's states that Great-grandmother suffered from dementia and anger issues and that, reportedly, Father had left Eric on either the couch or a chair when he went outside and that Great-grandmother was in the room with Eric when Father came back in. At that time, Eric "was not acting like himself" and was lethargic. It was reported to emergency responders that when Mother came home, Eric "was mildly responsive, pale[, and] mottled." The hospital notes also indicate that although Father told the ambulance service that Great-grandmother "maybe had something to do with this," the investigating police detective "noted that great grandmom had some difficulty getting up and down and required a cane."

**Arrest-Warrant and Police-Notes Version**

At the time of trial, Father was in jail awaiting trial for allegedly causing Eric's injuries.

According to police records, when officers searched the home, they found "blood stain evidence" on a bassinet, pacifier, and baby wipe in the master bedroom and on the right and left sides of the kitchen sink. They also found a soiled diaper and baby wipes in the master-bedroom trash can. Because the bloody baby wipe was found in the trash can under the soiled diaper, the investigators believed that "the child was treated for bleeding sometime before being changed for the soiled diaper.

According to the affidavit attached to Father's arrest warrant, when the first officer arrived at the home, Paternal Grandmother was holding Eric, who was

7

nonresponsive and breathing erratically. When the paramedics arrived, they began immediately to assess Eric; at that time, Father—without being asked—pointed to a bruise under Eric's jaw and stated that the bruise was not from abuse. The officer "found that statement to be odd since abuse was not determined at that moment."

About an hour after the police arrived at the home, a nurse called the police department to report that Eric was "showing signs of abuse trauma," that he was being sent to Cook Children's, and that she was making a referral to the Department of Family and Protective Services for "assault." During the police investigation, Mother said that she had been gone about 45 minutes when Father contacted her and that when she got home, she first called Father's mother to come help. Mother told the police that before she left that day, she had fed Eric and left him sleeping in his bassinet; he was "fine."

Father told the police that after Mother had left, he fed Eric a bottle and then went to the kitchen to make him another one. While at the kitchen window, he saw an old friend outside and went to go talk to him. Father gave different names for the friend. Father told police he was outside for about five minutes and had a video and audio baby monitor in his pocket,[2] but he never heard anything. When Father went back inside, Eric "was breathing funny and unresponsive."

---

[2]Although the police-department notes state that Father said he had the monitor's volume turned all the way up, this information is not in the arrest affidavit.

Great-grandmother told the police that after Mother left the house, Father was inside the bedroom with Eric. Eric was crying a lot but then stopped. A short time later, Eric whimpered.[3] Great-grandmother looked into the bedroom and saw Father "changing [Eric's] diaper" for what she thought was a long time. Father came out of the bedroom holding Eric face up; he took Eric to the sink and began putting water on him. But Father never wiped the water off, which Great-grandmother thought was strange. She asked Father what was wrong, but he did not respond. During this time, Father was trying to call Mother.

Cook Children's confirmed to the police that Eric had suffered a subdural hematoma, a subarachnoid hemorrhage, and retinal hemorrhages; he was also having seizures. Eric's injuries were life-threatening, and when he arrived, he was not stable enough for them to perform an MRI.

**Father's Version**

Father testified after being warned of his Fifth Amendment rights. Father confirmed that he was in the Wichita County jail and that he had been "picked up on" injury to a child. According to Father, though, he had been indicted only for family violence.[4] Father's trial date had not yet been set, and he did not expect one for at least two years because of the COVID-19 pandemic. When asked why he had

---

[3]The hospital report notes that Great-grandmother told the detective that the baby was crying while Father was in the bedroom with him; then, she heard "sudden screaming," which stopped and was replaced by whimpering.

9

considered pleading guilty to child endangerment, Father answered that he believed that was "more along the lines" of what he was guilty of. Father denied causing Eric's injuries.

Father said that when Eric was injured, Mother had gone out for about fifteen to twenty minutes to get groceries, and he was outside on the porch. He had left Eric in his "baby rocker" in the bedroom, and Great-grandmother was in the living room lying down on the couch. Father went out to the porch for about five to ten minutes. When asked what happened next, Father first invoked his Fifth Amendment right.

After taking the Fifth, though, Father testified that when he came back in the house, Eric was still strapped into his rocker[5] but was having trouble breathing. Great-grandmother was still on the couch, which was about ten to twelve feet away, up a two-step staircase to the bedroom. But she was sitting up on the far side of the couch instead of lying down as she had been when he went outside.

Father said that when he found Eric, his breaths were short and rapid; he was limp and did not respond when Father blew in his face. Father called Mother instead of 911; he admitted that he had not "assess[ed] the situation properly." After Mother

---

[4]The trial court admitted the indictment into evidence; it charges Father with committing continuous family violence under Family Code Section 71.003 both by allegedly causing Eric's injuries on July 5, 2019, and by impeding Mother's normal breathing or blood circulation on or about June 25, 2019. Tex. Fam. Code Ann. § 71.003.

[5]According to Father, Eric had never fallen out of his rocker, and the rocker was not capable of falling over.

got home, Father called his mother, and either she or Mother then called 911. Father estimated that about five to ten minutes passed between the time he noticed Eric's injuries and 911 was called. When asked what type of first aid he provided, Father said, "I didn't know what to do."

Father told the police that he had a baby monitor with him that had both audio and video capability. But Father never heard Eric cry. Although Father spoke to law enforcement, he did not talk to the doctors at Cook Children's because he was "extremely upset."

According to Father, Great-grandmother was the only one in the house when Eric's injuries occurred. Nevertheless, he did not ask her what had happened while he was out because, according to Father, "I knew she hurt . . . my baby." He could not say why he never spoke to her, saying that it was "probably not the right thing for me to just ask her about that, not me." But when trying to explain why he told law enforcement that he did not think Great-grandmother had hurt Eric, Father explained that he did not think so "at first"; he did not think Great-grandmother had done anything to Eric until he "was calling" Mother. Father said he was in shock and had not noticed Eric's injuries, including the broken bones and bleeding from the mouth.

When asked whether he had endangered his son, Father admitted that his being outside and not watching over Eric "led to circumstances" that endangered him. Father said that while out on the porch, he had been talking to a high-school friend

whose last name he could not remember; Father pleaded the Fifth when asked how his friend had come to be at the house.[6]

Father admitted that Great-grandmother had some trouble walking and used a walker "[m]ost of the time." He confirmed that when she walked out of the house the day Eric was injured, she needed assistance. But Father thought Great-grandmother "was milking it." When asked how Great-grandmother could have gotten up from the couch, injured Eric, left him in his rocker, and gotten back to the couch in such a short amount of time, Father said that although she needed help walking with either a walker or shoulder to lean on "most of the time," which he estimated to be about 95%, he did not believe she needed help "all the time." He had seen her walk without assistance before and did not wish to speculate on how she could have injured Eric. She "absolutely" could lift things. Father believed Great-grandmother could have gotten into the bedroom, caused Eric's injuries, and gotten back to the couch in such a short time because "she was only weak in her legs."

**Mother's Perspective**

Mother originally thought that Great-grandmother had caused Eric's injuries, but after hearing the police evidence—blood in the sink and bassinet and the fact that Father had a friend over he did not tell Mother about—she believed Father had caused the injuries. According to Mother, Great-grandmother had a chronic back

---

[6]Other evidence showed that police had arrested Father many times, including at least once for drug-paraphernalia possession.

issue and a broken spine; she could not walk more than five or six steps by herself and had fallen the day Eric was injured. Mother did not think Great-grandmother was strong enough to cause Eric's severe injuries in such a short time, but she did think Father was strong enough. Mother was also concerned that Father never called for medical or law-enforcement help.

**Great-grandmother's History**

Father testified that Great-grandmother had a "mental health history" and a "bad family violence history." Father had heard Great-grandmother verbally threaten Mother and her relatives, and he "believe[d]" that "they've all been physically abused by" Great-grandmother.

Great-grandmother had lived with him and Mother several times before and engaged in "violent . . . mental and verbal abuse" and "sometimes physical abuse," including toward the dog. One time before Eric was born, Father and Mother called law enforcement because Great-grandmother had threatened Mother and her unborn son; law enforcement took Great-grandmother to the state hospital on a mental-health warrant. Mother confirmed Father's testimony that Great-grandmother had threatened her and Eric with harm and that they had to call the police to have Great-grandmother removed on a mental-health warrant. Father understood and Mother confirmed that Great-grandmother had been kicked out of residential "care-type settings" for "violent behavior . . . [and] conduct towards staff and other residents, adults." Nevertheless, when Father left Great-grandmother in the house with Eric

13

that day, he did not think that she could have hurt him because he "thought she could have a change of heart" and would not "hurt a little baby."

Mother had previously testified that Great-grandmother had raised her until she was sixteen or seventeen; her childhood "wasn't horrible." Great-grandmother's mental health did not deteriorate until January 2019. But in June 2019, Great-grandmother had threatened to kill her twice while the police were present. According to Mother, that was the only time Great-grandmother had been violent or aggressive toward Mother, and she had not seen her act that way with anyone else.

Mother said that, physically, Great-grandmother had needed help to walk up the five porch steps into her house; whoever helped her "would put one arm under hers and assist her up." Mother did not think it possible for Great-grandmother to go up those steps by herself. She did not think Great-grandmother could have inflicted the twisting injury to Eric's legs because "[s]he has no strength."

**Other Evidence**

Mother testified that Father had been physically violent with her in the past; he would get angry when "he didn't get his way," and he had choked her, bruised her, taken her money and car keys, and punched holes in the wall. When asked whether he had physically assaulted Mother when Eric was only a few days old, Father denied any physical contact with Mother but said he remembered "more of a verbal altercation" with "[t]he only physical damage . . . to the drywall of the house."

14

The trial court admitted medical records for Father showing that in April 2019, a couple of months before Eric's birth, Father was admitted to the emergency room with nausea and vomiting and had admitted to drinking "2-3 drinks per day" for a couple of weeks. He was diagnosed with alcohol-induced acute pancreatitis without infection or necrosis. He left against medical advice. Although Father's health records also indicate that he had drug-abuse problems as a teenager, Father denied having a drug problem when Eric was injured.

In the jail while awaiting trial on his charge for allegedly injuring Eric, Father had been on suicide watch three times. But Father told at least one mental-health evaluator that he had wanted merely to stay out of the general jail population because of the nature of his charges. Mother told the social worker at Hospice that she and Father had previously had a good relationship but that he had started showing signs of mental illness and refused to get help.

**Application and Conclusion**

Father relies primarily on his own testimony to argue that the State failed to prove by clear and convincing evidence that he endangered Eric. Mother did confirm some but not all of Father's testimony about Great-grandmother. Although we consider what Mother confirmed as undisputed, much of Father's testimony was contradicted; therefore, the trial court did not have to take that evidence as true, nor did the trial court have to consider Father credible. *See, e.g., In re J.F.,* 2016 WL 7584309, at *7 ("The trial court could reasonably have resolved any conflict

15

in the evidence by not crediting J.F.'s explanation and forming a firm conviction or belief that J.F. caused the injuries to the children.'").

Even without direct evidence of who caused a child's severe injuries consistent with child abuse, strong circumstantial evidence can still meet the clear-and-convincing standard. *See, e.g.*, *id.* Here, strong circumstantial evidence existed that Father was responsible for Eric's injuries, including (1) the circumstances of the injuries and physical evidence at the scene, which corresponded to what Great-grandmother told officers rather than what Father told them; (2) Father's evasiveness with officers, the implausible nature of part of what he told them, and his conduct consistent with a guilty conscience; (3) his propensity for violent behavior; and (4) evidence of Great-grandmother's physical infirmity and age juxtaposed with the extent of Eric's injuries. The trial court was not required—nor are we—to give more weight to Father's characterization of Great-grandmother's physical abilities than to Mother's characterization or to the police officer's direct observations. Nor are we required to focus on the absence of expert evidence, as Father urges us to do.

Based on our review of the record, including Father and Mother's history as well as the July 5, 2019 events, we hold that the Department presented legally and factually sufficient evidence to support the trial court's subsection (D) and (E) endangerment findings. *See id.*; *In re K.S.*, No. 09-14-00222-CV, 2014 WL 4755500, at *3 (Tex. App.—Beaumont Sept. 25, 2014, pet. denied) (mem. op.); *In re D.A.*, No. 02-14-00076-CV, 2014 WL 3778234, at *22–23 (Tex. App.—Fort Worth July 31, 2014,

16

no pet.) (mem. op.). We therefore overrule Father's two issues on appeal and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  September 9, 2021